UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEPHEN ONYEBUCHI,

    Plaintiff,

    v.

HOWARD UNIVERSITY HOSPITAL,

    Defendant.

Case No. 1:22-cv-03089 (TNM)

**MEMORANDUM OPINION**

Stephen Onyebuchi used to work as a nurse for Howard University Hospital. Howard fired him in November 2020 after an incident in which he used an improvised heating pad that caused a patient blisters. Onyebuchi claims that he was treated differently from other nurses involved in that incident. He says this disparate treatment was because he is black and of Nigerian descent. Howard has moved for summary judgment on both of Onyebuchi's claims, and because Onyebuchi has failed to produce evidence of differential treatment, the Court will grant its motion.

I.

Steven Onyebuchi, a black man from Nigeria, was formerly employed as a nurse by Howard University Hospital. Onyebuchi Decl. ¶¶ 2–4, 11, 32, 34, ECF No. 18-3. He started at Howard in early 1999 and worked there until he was dismissed in 2020. *Id*. ¶¶ 2, 4. He served his 21 years there without incident and was consistently rated as "meeting expectations" with minimal issues aside from occasional attendance problems. Heaven Decl. ¶¶ 5–6, ECF No. 16-4. Howard, for its part, is a historically black college or university (or HBCU), *Newman v. Howard*

*Univ. Sch. of Law*, --- F. Supp. 3d ---, 2024 WL 450245, at *1 (D.D.C. 2024), that runs a major hospital in Washington, D.C.

Within the hospital, Onyebuchi's chain of command was predominantly black. Onyebuchi's boss, Jennifer Heaven, was black. Heaven Decl. ¶ 2. His boss's boss, Melissa Edwards, was also black. *Id*. ¶ 3. And his boss's boss's boss, Dr. India Medley, was black, too. *Id*. ¶ 4. Indeed, only one decisionmaker involved in Onyebuchi's case was white: Paul Mancini, the Executive Director of Labor and Employee Relations who actually decided to fire Onyebuchi. Mancini Decl. ¶¶ 2–4, ECF No. 16-5. But Onyebuchi has specifically disavowed any claim that Mancini discriminated against him. Onyebuchi Dep. Tr. at 283:12–15, ECF No. 16-8. Indeed, he has stated that "Heaven is the only person at Howard University Hospital who discriminated against" him. *Id*. at 104:20–105:2.

Onyebuchi's peers at Howard were of diverse backgrounds. Several nurses within his component were of Nigerian origin. Heaven Decl. ¶ 35. Four other non-Nigerian nurses are also relevant here: Onyebuchi's colleagues Abeba Gebrehiwot and Eden Tsegaye are both of Ethiopian descent, *id*. ¶ 36; Reply at 5 n.1, ECF No. 19; Carice Pagatpatan is Filipino, Mot. for Summ. J. (Mot.) at 5, ECF No. 16-2; and Getamesay Yadete is of unspecified non-Nigerian African origin, Opp'n at 14, ECF No. 18-1.

This case stems from events that took place beginning October 8, 2020. On that night, Dr. Mahin Janhua ordered that a patient with back pain be provided a heating pad to ameliorate her pain. Heaven Decl. ¶ 11. But the hospital had no heating pads available. *Id*. So Gebrehiwot created an improvised heating pad by microwaving a cup of water and then pouring the hot water into a cold pack to apply to the patient's back. *See* Adverse Event Review Rep. at 2, ECF No. 18-10. The next nurse on shift, Tsegaye, Heaven Decl. ¶ 13, applied an ice pack, Treatment

Notes, ECF No. 16-10, but failed to examine the patient or document any blistering, Heaven Decl. ¶ 34.

Onyebuchi replaced Tsegaye on shift and continued through the morning of October 10. Heaven Decl. ¶ 14.  He, too, created an improvised heating pad for the patient.  *Id*. ¶ 15.  And he did so much like Gebrehiwot, by heating a cup of water in the microwave for two minutes, Onyebuchi Dep. Tr. at 209:1–6, and pouring it into a cold pack to apply to the patient's back.  *Id*. at 208:4–22.  Onyebuchi applied such an improvised device to the patient twice during his shift: once shortly after arriving at 11:43 p.m. and once shortly before leaving the next morning at 7:20 a.m.  *Id*. at 253:3–9.  Although he documented the first application of the heating pad in his notes, he omitted any mention of the second.  Heaven Decl. ¶¶ 16–17.

Onyebuchi was relieved on the morning of October 10 by Pagatpatan.  Heaven Decl. ¶ 20.  Shortly after beginning her shift, Pagatpatan and her trainee nurse, Yadete, examined the patient and discovered "two large blisters on her buttocks."  *Id*. ¶ 21.  This was "[w]ithin approximately one hour after the start of the shift," Pagatpatan Decl. ¶ 4, ECF No. 16-6, meaning at or before 8:30 a.m., *id*. ¶ 3.  Indeed, the likely time was around 8:23 a.m., when the patient "refused to transfer from [her] bed to [a] stretcher" to be transported to a computed tomography (CT) scan because "her back hip was h[u]rting."  Clinical Notes Rep. at 2, ECF No. 18-6. Pagatpatan recorded the blisters in the patient's clinical notes at 10:47 that morning.  *Id*.  This was the first report of blisters in the patient's records.  *Id*.

Pagatpatan prepared an incident report, Heaven Decl. ¶ 22, and Heaven and Edwards investigated, *id*. ¶¶ 8–9.  The investigation "consisted of a review of relevant documentation and interviews of four nurses" involved.  *Id*. ¶ 9.  That investigation produced "no evidence" that Pagatpatan or Yadete had applied an improvised heating device to the patient.  *Id*. ¶ 23.  But it

did reveal that Gebrehiwot and Onyebuchi had done so. *Id.* ¶ 26. Based on that investigation, Heaven and Edwards concluded that Gebrehiwot and Onyebuchi "should be terminated for having created and used unauthorized devices." *Id.* ¶ 25. They prepared a written report to that effect, which was approved by Dr. Medley, the Chief Nursing Officer. *Id.* ¶ 31. The report was then sent to Mancini. *Id.* ¶ 30.

Mancini agreed that the Gebrehiwot and Onyebuchi's behavior constituted "significant inappropriate conduct." Mancini Decl. ¶ 17. He determined that Heaven and Edwards's factual conclusions were based on a "reasonable evaluation of evidence" and "were arrived at fairly and reasonably." *Id.* ¶ 18. Based on those facts, Mancini concluded that it was "obvious" that Onyebuchi "had engaged in terminable misconduct, resulting in an injury to the patient." *Id.* ¶ 21. And Onyebuchi's years of service at Howard did not mitigate the severity of his misconduct this time. *Id.* ¶ 20. Thus, Mancini fired Onyebuchi, effective immediately. *Id.* ¶ 4. He likewise fired Gebrehiwot. *Id.* ¶ 17. But Tsegaye, who was not found to have applied a heating pad, remained employed by Howard.

## II.

"The Federal Rules of Civil Procedure empower district courts to direct the entry of judgment before, during, or after trial." *Dupree v. Younger*, 598 U.S. 729, 731 (2023). Before trial, but after the parties have had an opportunity through discovery to "marshal evidence supporting their claims and defenses," a court may grant summary judgment to either party under Rule 56, *id.*, if that party shows that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The essential purpose of this standard is to "avoid the expense of trial where a trial would be a useless formality because no factfinder could find for the nonmoving party." *Mass. Coal. for Immigr. Reform v. U.S. Dep't*

*of Homeland Sec.*, --- F. Supp. 3d ---, 2023 WL 6388815, at *5 (D.D.C. 2023) (internal quotations omitted).

Onyebuchi has asserted that Howard discriminated against him on account of his race and national origin. A plaintiff presenting such claims may prove that he was discriminated against through either direct or circumstantial evidence. *Newman*, 2024 WL 450245, at *9–10. Where, as here, the plaintiff has presented no direct evidence of discrimination, he must proceed under the framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Newman*, 2024 WL 450245, at *10.

Under that framework, a plaintiff has the initial burden to make out a prima facie case of discrimination. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). If he does so, the burden shifts to the defendant to provide "some legitimate, nondiscriminatory reason for the action in question." *Id*. (cleaned up). Once the defendant does, all that remains is for the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id*.

But there is a shortcut. If the defendant gives a nondiscriminatory reason for the adverse employment action, the plaintiff's burden to make out a prima facie case falls away. Then, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

### III.

Onyebuchi claims Howard discriminated against him on two grounds: his race and national origin. But Howard has provided a facially nondiscriminatory reason for firing him. It claims he failed to uphold its standard of care when his improvised heating pack caused a patient painful blistering. Onyebuchi Termination Rec. at 6, ECF No. 16-11; Onyebuchi Termination

Letter, ECF No. 16-12. And Onyebuchi concedes that this reason satisfied Howard's burden. *See* Opp'n at 15–16. So, because Howard has put forward a legitimate reason for Onyebuchi's firing, the sole question at this stage is whether there is a genuine issue of material fact over the sincerity of Howard's proffered justification. *Brady*, 520 F.3d at 494.

Before getting into all that, two factual clarifications are needed. First, the parties dispute what exactly Onyebuchi's coworker, Tsegaye, did. Discovery revealed two different Adverse Event Review Reports: One describes Tsegaye as having applied an improvised *heating* pack, Adverse Event Review Rep. at 2, while the other describes her as having applied an *ice* pack, Revised Adverse Event Review Rep. at 2, ECF No. 19-2 pp. 8–9.

As Howard's Director of Labor & Employee Relations explains it, the initial Adverse Event Review Report contained certain factual inaccuracies, Supp. Decl. of Latisha Lane ¶¶ 7, 9–10, ECF No. 19-2 pp. 2–4, and was corrected within a day of being issued, Second Edwards Email, ECF No. 19-2 p. 14. All other record evidence supports the revised report's finding that Tsegaye applied an ice pack, including *Onyebuchi's own affidavit*. Onyebuchi Decl. ¶ 35; *see also* Treatment Notes at 1, ECF No. 16-10; Investigation Rep. at 3–4, ECF No. 16-9. More, the initial Adverse Event Review Report was compiled before the investigators could interview the nurses. Edwards Email at 1, ECF No. 19-2 pp. 11–12.

The only reasonable reading of the record is that the initial report was only an internal draft that did not express the final views of the investigators on what occurred. So, although there may be *a* dispute of material fact on this point, it is not a *genuine* one. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). This is

especially so because Howard's explanation fits with Onyebuchi's own testimony. *See* Onyebuchi Decl. ¶ 35. The Court therefore relies on the factual findings of the second, final Adverse Event Review Report.

Second, there is some ambiguity as to how many improvised heating pads Onyebuchi applied. Onyebuchi claims in his affidavit that he applied only one. *See* Onyebuchi Decl. ¶¶ 21, 56. But in his deposition, he said that he applied two. Onyebuchi Dep. Tr. at 253:3–9. The sham affidavit rule prevents parties from creating a genuine issue of material fact by submitting an affidavit that contradicts their earlier deposition testimony. *Galvin v. Eli Lilly Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007). So the Court takes Onyebuchi at his prior word and concludes that he applied *two* improvised heating packs, not one. But ultimately, this issue is not dispositive to the Court's decision.

## A.

Start with Onyebuchi's claim that he was discriminated against based on his race. The question at this stage is whether he has adduced such evidence as would create a genuine issue of material fact about whether his firing was because of his race. Fed. R. Civ. P. 56(a). He has not.

Nearly every relevant decisionmaker in Onyebuchi's case was black. His boss, his boss's boss, and his boss's boss's boss were all black. Heaven Decl. ¶¶ 2–4. The supervisors who investigated the incident were both black. *Id.* ¶¶ 2–3, 8–9. The only non-black decisionmaker who was involved was Mancini, whom Onyebuchi has disavowed any claim of discrimination against. Onyebuchi Dep. Tr. at 283:12–15. And it is improbable that these individuals discriminated *against their own race*. Indeed, "Courts in our District have repeatedly held that a decision-maker's inclusion in the same protected class as the terminated plaintiff cuts against any inference of discrimination." *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144

(D.D.C. 2017). So it is doubtful from the get-go that Onyebuchi was discriminated against for his race.

More, there is no better-treated comparator of another race that Onyebuchi can point to. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296–97 (D.C. Cir. 2015). Onyebuchi claims that several people failed in their performance relating to the blistered patient: himself, Gebrehiwot, Tsegaye, and Pagatpatan. But recall that Tsegaye was not similarly situated to Onyebuchi because she did not, in fact, apply a heating pad. *See id.*, at 301. And although he asserts that Pagatpatan also applied one, he produced no evidence except his say-so to support this claim. *See* Onyebuchi Decl. ¶ 33. Although an affidavit from a plaintiff can create a genuine issue of material fact, it does not do so here. Onyebuchi lays no foundation for the Court to infer he has personal knowledge of the facts he asserts. *See* Fed. R. Evid. 602. He never explains how he knew what Pagatpatan did. Nor does he explain how he even *could* know what she did, given that he was not present and was suspended immediately after. So his naked assertion, which on this record is no more than speculation, is insufficient. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (noting that where an affiant's belief is "speculative" and "not based upon [the affiant's] or anyone else's actual knowledge," his affidavit cannot create a genuine issue of material fact); *see also Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008) ("The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment.").

So there are really only two similarly situated individuals here: Onyebuchi and Gebrehiwot. But both similarly situated individuals were of the same race, and both received the same punishment: termination. There was no similarly situated individual of another race treated better than Onyebuchi was.

8

And even if the Court were to credit Onyebuchi's reading of the Adverse Event Review Report, that conclusion would not change. Then, there would be a single similarly situated better-treated individual: Tsegaye. But Tsegaye is *also* black. Sec. Onyebuchi Dep. Tr. at 125:19–126:1, ECF No. 19-1. And there can be no inference of discrimination from the fact that different members of the same race were treated differently from one another. *Cf. Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) (finding that an employee was fired and replaced with another member of the same protected class "cuts strongly against any inference of discrimination").

Against all that, Onyebuchi simply claims that Howard's "stated reasons for termination are false." Opp'n at 13. But the question is not whether the reason for termination is false, but whether the defendant *believed it to be false*. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). To be sure, providing a false explanation may be evidence of subjective disbelief—for example, when a defendant employer lies to cover up a discriminatory firing. But even then, the touchstone is the decisionmaker's subjective belief about why he is firing the plaintiff. In order to reject this subjective-belief standard, Onyebuchi cites a single out-of-circuit, unpublished appellate decision, *Burgess v. Bowen*, 466 F. App'x 272 (4th Cir. 2012). This does him no good. This circuit's precedent is clear on this point. *See Fischbach*, 86 F.3d at 1183. And Onyebuchi has presented no evidence indicating that Howard subjectively disbelieved its proffered reason for firing him.

In sum, Onyebuchi has failed to create a genuine issue of material fact as to whether Howard's facially nondiscriminatory reason was pretextual. And he has thus failed to create one as to whether he was fired because of his race. So his race-discrimination claim fails as a matter of law.

9

### B.

Onyebuchi also claims he was discriminated against for being Nigerian. He has again failed to create a genuine issue of material fact as to whether Howard's stated reasons for firing him were pretextual.

For this claim, Onyebuchi relies more explicitly on comparator evidence. He and Gebrehiwot were fired; Tsegaye was not. He is Nigerian; Tsegaye is not. Although this is closer to a triable jury issue than his race-discrimination claim, it still does not cut it.

First, Gebrehiwot and Tsegaye are of the same national origin: Ethiopian. Heaven Decl. ¶ 36; Reply at 5 n.1. One was fired, the other was not. *See* Investigation Rep. at 3–4 (recommending termination for Gebrehiwot but "written coaching" for Tsegaye). Although neither was Nigerian, the fact that members of the same protected class fell on both sides of the termination decision is evidence that something other than discrimination was at work here. If Onyebuchi's firing was because of his national origin, one would expect *both* non-Nigerian comparators to be better treated than him. But that is not so.

And the fact that Onyebuchi was the only Nigerian in a pool of employees this small cannot mean that any decision to fire him is immediately suspect. Such a rule would render any employee who is the sole member of a protected class effectively "un-fireable" without significant litigation risk. In short, he needs more than just being the only Nigerian in his small comparator set to create a viable inference of discrimination. *Cf. United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) ("[T]he fact that the [struck] juror was the one Black member of the venire does not, in itself, raise an inference of discrimination.").

More, Tsegaye is not a suitable comparator to Onyebuchi in the first place. Tsegaye informed Heaven and Edwards during their investigation that she had not applied an improvised

heating pad to the patient, but rather a cold compress. Investigation Rep. at 3–4. And the investigation revealed contemporaneous treatment notes that confirmed this. Treatment Notes at 1. So when the investigators recommended that Tsegaye receive only "written coaching" instead of termination, Investigation Rep. at 4, it reflected a difference in her conduct, not a discriminatory animus. But if Tsegaye did not engage in the same conduct as Onyebuchi, then she cannot serve as a comparator, and her non-firing provides no evidence supporting his claim of national origin discrimination. *Burley*, 801 F.3d at 301.

Last, just as before, Onyebuchi has presented no evidence that Howard's employees did not *subjectively believe* that their basis for terminating him was valid. Even if he is correct that Tsegaye *did* apply a heating pad instead of a cool pack, he has provided no evidence that would suggest that the Howard decisionmakers believed that, too. Quite the opposite. The contemporaneous notes documenting Tsegaye's treatment suggest that Howard's employees genuinely believed that she had applied the cool pack that she claimed to have applied. Treatment Notes at 1. And likewise for Heaven and Edwards's notes of their interview with Tsegaye. Investigation Rep. at 3–4.

So again, the Court is left with no evidence suggesting that Onyebuchi's termination resulted from anything but Howard's genuine belief that he had violated its standards of care when he applied an improvised heating pad to a patient and caused her severe blistering. This claim therefore also fails.

## C.

Finally, Onyebuchi's claims fail for one last reason. Ordinarily, a discrimination plaintiff must show that *the decisionmaker*, not some uninvolved subordinate, discriminated against him. *See Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1311 (D.C. Cir. 1998). But the

decisionmaker here was Mancini, not Heaven, Mancini Decl. ¶¶ 2–4, and Onyebuchi explicitly conceded that Mancini did not discriminate against him. Onyebuchi Dep. Tr. at 283:12–15 ("Q: Okay. So you—just so that we're clear, Mr. Mancini did not discriminate against you, correct? A: Yeah."). And Onyebuchi never claims that Mancini was the "unwitting conduit" or "cat's-paw" for "another actor's illicit motives." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). Nor does he claim that Mancini's decision took a "supervisor's biased report . . . into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011). So, because Onyebuchi's claims of discrimination were entirely directed at someone who did not make the decision to fire him, and whose own role was diluted because she was forced to work with another individual in investigating his misconduct, they fail for this reason, too.

## IV.

The termination of a long-tenured, dedicated employee is inevitably unfortunate for all involved. But employers have significant latitude to discipline misconduct, and the bar to showing illegal discrimination is high. Onyebuchi cannot meet that standard here. A separate Order will issue today.

Dated: April 18, 2024                                            TREVOR N. McFADDEN, U.S.D.J.